# EXHIBIT A-25

KEKER & VAN NEST LLP
ROBERT A. VAN NEST - # 84065
rvannest@kvn.com
JEFFREY R. CHANIN - # 103649
jchanin@kvn.com
STEVEN P. RAGLAND - # 221076
sragland@kvn.com
NICHOLAS D. MARAIS - # 277846
nmarais@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

Attorneys for Plaintiff SANDISK CORPORATION

E-FILED
May 19, 2014 1:16 PM
David H. Yamasaki
Chief Executive Officer/Clerk
Superior Court of CA, County of Santa Clara
Case #1-14-CV-262078 Filing #G-63136
By A. Ilas, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

SANDISK CORPORATION,

Plaintiff,

v.

SK HYNIX, INC., SK HYNIX AMERICA, INC., SK HYNIX MEMORY SOLUTIONS and DOES ONE through TEN, inclusive,

Defendants.

Case No. 1:14-CV-262078

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SANDISK CORPORATION'S NOTICE AND *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION**

Date: May 20, 2014
Time: 10:00 a.m.
Dept.: 1 (Complex Civil Litigation)
Judge: Hon. Peter H. Kirwan

Date Filed: March 13, 2014

Trial Date: None set

**FILED CONDITIONALLY UNDER SEAL**

**REDACTED VERSION**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....... 1
II. BACKGROUND ....... 3
A. SanDisk spent decades developing and protecting its trade secret information. ....... 3
B. SanDisk and Toshiba conduct joint development operations in Japan. ....... 3
C. SanDisk makes reasonable efforts to protect its trade secret information. ....... 4
D. Sugita stole SanDisk's trade secrets at Hynix's direction and Hynix received them knowing they had been misappropriated. ....... 5
E. Nakao provided copies of some of the stolen SanDisk files that were maintained on Hynix's network. ....... 6
F. Evidence from the Tokyo Police corroborates Nakao's accusations. ....... 7
G. Hynix was economically motivated to induce Sugita's misappropriation. ....... 8
H. SanDisk acted promptly to seek Hynix's return of its stolen property, but Hynix ignored and then refused SanDisk's requests. ....... 9
III. ARGUMENT ....... 10
A. A temporary restraining order is necessary to prevent further harm to SanDisk. ....... 10
1. SanDisk's likelihood of success is high. ....... 11
2. SanDisk will suffer irreparable harm if its trade secrets remain under Hynix's custody and control. ....... 13
3. The requested relief is narrowly tailored to address Sugita's misappropriation and will not burden Hynix. ....... 14
IV. CONCLUSION ....... 15

# TABLE OF AUTHORITIES

Page(s)

## Federal Cases

*Bank of America, N.A. v. Immel*
2010 WL 2380877 (N.D. Cal. June 11, 2010) ..... 15

*TMX Funding, Inc. v. Impero Techs., Inc.*
Civ. No. 10-00202, 2010 WL 1028254 (N.D.Cal. Mar.18, 2010) ..... 13

*W. Directories, Inc. v. Golden Guide Directories, Inc.*
Civ. No. 09-01625, 2009 WL 1625945 (N.D. Cal. June 8, 2009) ..... 13

*Winter v. Natural Res. Def. Council, Inc.*
555 U.S. 7 (2008) ..... 14

*Wyndham Resort Devel. Corp. v. Bingham*
Civ. No. 10-01556, 2010 WL 2720920 (E.D. Cal., July 8, 2010) ..... 14

## State Cases

*ABBA Rubber Co. v. Seaquist*
235 Cal. App. 3d 1 (1991) ..... 11

*Butt v. State of California*
4 Cal. 4th 668 (1992) ..... 11

*Common Cause of California v. Bd. of Supervisors*
49 Cal. 3d 432 (1989) ..... 11

*Hunt v. Superior Court*
21 Cal. 4th 984 (1999) ..... 11

*IT Corp. v. County of Imperial*
35 Cal. 3d 63 (1983) ..... 14

*Robbins v. Super. Ct.*
38 Cal. 3d 199 (1985) ..... 15

*Whyte v. Schlage Lock Co.*
101 Cal. App. 4th 1443 (2002) ..... 11

## State Statutes

Cal. Civ. Code § 3426.1 ..... 11

Cal. Civ. Code § 3426.2 ..... 11

## Treatises

Restatement (Third) of Unfair Competition, § 44 ..... 14

## I. INTRODUCTION

SanDisk Corporation seeks a temporary restraining order and a preliminary injunction requiring the Hynix[1] defendants to cease using and return all copies of stolen SanDisk and Sandisk–Toshiba confidential information known by Hynix to be in its possession or use. The information was stolen and served up to Hynix by a former Hynix employee that Hynix hired from SanDisk, Yoshitaka Sugita. Hynix has no right to retain SanDisk's stolen property, which it apparently induced Sugita to steal for its benefit. On March 12, 2014, just hours after Sugita was arrested by the Tokyo Metropolitan Police, SanDisk requested that Hynix cease using and return its stolen property. Hynix ignored those requests for seven weeks, even after SanDisk calendared this *ex parte* hearing, and then—after its counsel induced SanDisk to continue the hearing—rejected them. A TRO is needed because, as long as the stolen information remains in Hynix's possession, there remains a threat of further misuse and disclosure that SanDisk cannot prevent, as well as potential spoliation. Such harm would be serious and irreparable, while the burden of returning SanDisk's information is trivial in comparison.

Hynix's industrial espionage targeted the "crown jewels" of SanDisk's cutting-edge NAND flash memory trade secret technology—its designs and design manuals, its research and development records, and the detailed process flow steps and recipes used to fabricate SanDisk's devices. At the time of the misappropriation, Hynix's market share was dropping and it could not compete with SanDisk's more robust, reliable and compact NAND flash memory devices. After the theft, Hynix's fortunes changed: its NAND flash memory products improved, its development timeline shrank, and it made significant competitive gains that continue to this day.

SanDisk's joint venture partner Toshiba alerted SanDisk to Hynix's misappropriation on January 24, 2014, when it shared an email it had obtained from a former Hynix employee blowing the whistle on Hynix's theft. The whistleblower, Hironobu Nakao, reported that SanDisk's trade secret information was "frequently displayed … in Hynix's office and explained … to Hynix employees," that it was distributed "to Hynix's employees by … email," and even more egregiously, that "***Hynix [had] requested that Sugita … download [SanDisk's]***

[1] Unless otherwise noted, "Hynix" refers collectively to the three defendants in this case.

***files before Sugita resigned from SanDisk.***"

SanDisk promptly investigated, obtained evidence confirming Nakao's assertions, and contacted the Tokyo Police, who had already begun an investigation based on Toshiba's report. The Tokyo Police arrested Sugita on March 13, 2014 (March 12 in the United States). Immediately on learning that Sugita was in custody, SanDisk notified Hynix that it would file suit for misappropriation of its trade secrets (which SanDisk did the following day), reminded Hynix of its obligation to preserve documents, and demanded that Hynix "cease and desist any and all use of [SanDisk's trade secret information]" and immediately return all SanDisk information in its possession. On March 14, Hynix acknowledged receipt of SanDisk's letter and complaint.

Then Hynix stuck its head in the sand. It ignored SanDisk's demands. Its retained counsel, Paul Hastings, did not contact SanDisk's counsel or enter an appearance, even though they apparently helped Hynix conduct an internal investigation. Hynix stood silent even after the Tokyo District Public Prosecutor's Office charged Sugita with fraudulent acquisition of trade secrets and Sugita reportedly confessed to stealing SanDisk's trade secrets at Hynix's request. On April 9, after four weeks had passed without a word, SanDisk reserved the next possible date for an *ex parte* hearing, May 9. Still, there was no response. Finally, on April 30, nine days before the *ex parte* hearing, Hynix's counsel, Barry Sher and John Phillips, called to request a continuance of the motion date. They said they were not available to appear on the date SanDisk had reserved (three weeks before) because most of their team was in Asia.

On May 1, SanDisk reiterated its cease using and return demands, and offered to provide a list of search terms to facilitate Hynix's collection. Hynix's counsel said they would consider the request; as a result, SanDisk agreed to continue the hearing to May 13, and to take its Motion off calendar if Hynix agreed to comply.[2] Late on May 7, Hynix's counsel explained that Hynix would not return SanDisk's stolen materials. They did not deny that Hynix misappropriated or possesses SanDisk's trade secrets, but blithely responded "we do not believe your client's latest demands have any merit"—notwithstanding Sugita's confession and the undeniable evidence of Hynix's guilt. A TRO is now needed to protect SanDisk from further harm.

[2] As May 13 approached, the Court asked to reschedule the hearing to May 16 or 20; Hynix's counsel again responded that they were unavailable on the earlier date, and so the hearing was continued to May 20.

## II. BACKGROUND

### A. SanDisk spent decades developing and protecting its trade secret information.

SanDisk was founded in Silicon Valley in 1988 and is today a Fortune 500 company with annual revenues exceeding $6 billion. *See* Declaration of Atsuyoshi Koike in Support of SanDisk Corporation's *Ex Parte* Application ("Koike Decl."), ¶ 2. SanDisk designs and manufactures NAND flash memory—a tiny, reliable and durable form of memory at the heart of many modern devices, such as USB flash drives, solid-state drives, digital camera cards, cellphones and digital audio players. *Id.* at ¶ 6. Flash memory is constructed using semiconductor chip technology, which gets ever smaller and more complex with each new generation. Typically, the industry releases a new generation of technology every few years, with each generation identified by its smallest feature size (*e.g.*, 43 nanometers—which is less than 1/2000th the width of an average human hair). SanDisk released its 43nm NAND flash memory in 2008, and its 32nm NAND flash memory in 2009. *See* Declaration of Steven Ragland in Support of SanDisk Corporation's *Ex Parte* Application ("Ragland Decl."), Exs. A and B. Because different companies offer products of slightly different sizes, products in the 40–49nm range are often referred to collectively as "4x," those in the 30–39nm range are referred to as "3x," and so on.

SanDisk's success in this industry derives from decades of effort and billions of dollars invested in research and development. Koike Decl., ¶ 3. SanDisk is headquartered in Milpitas, and its California-based engineers supervise R&D activities conducted in 16 different countries, including Japan. *Id.* at ¶¶ 2–3. Throughout the time period relevant to this lawsuit, and currently, SanDisk is an acknowledged global innovator that has secured and maintained a competitive advantage over others in the industry who do not know its technical information.

### B. SanDisk and Toshiba conduct joint development operations in Japan.

SanDisk has partnered with the Toshiba Corporation ("Toshiba") in various NAND flash memory joint development efforts. Koike Decl., ¶ 4. Since 2002, SanDisk and Toshiba have jointly researched and manufactured NAND flash memory at a facility in Yokkaichi, Japan. *Id.* In 2008, SanDisk and Toshiba entered into a Joint Memory Development Yokkaichi Agreement ("JMDYA") that remains in effect. *Id.* at ¶ 4 and Ex. 1. Under that agreement, SanDisk retains exclusive rights to all of its own intellectual property, and non-exclusive, but independent, rights

to all intellectual property, including trade secrets, developed in partnership with Toshiba (all, collectively, "SanDisk information"). *Id.* at Ex. 1, § 3.02(b).[3] The agreement also allows SanDisk to exploit these rights without Toshiba's consent. *Id.*[4]

**C. SanDisk makes reasonable efforts to protect its trade secret information.**

SanDisk's trade secret NAND technology know-how is typically embodied in internal documents that it considers and keeps confidential. Koike Decl., ¶ 7. Such know-how includes semiconductor chip, device and system designs and design manuals, and the detailed semiconductor fabrication process flows, steps and recipes that a competitor could use to recreate SanDisk's products or improve its own. *See* Declaration of Fumitoshi Ito in Support of SanDisk Corporation's *Ex Parte* Application for Temporary Restraining Order ("Ito Decl."), ¶¶ 16–17; Koike Decl., ¶¶ 7, 26. SanDisk's trade secrets also include test protocols that reveal development approaches that SanDisk pursued or elected not to pursue after evaluation of the results—information that a competitor could use to shave years off its development timeline by learning in advance both what works and what to avoid. Ito Decl., ¶¶ 16–17. The know-how developed for one generation of technology has applicability for future generations to come, since engineers tasked with developing a new generation of technology start with their legacy designs and processes—reusing what will still work, modifying where necessary, or trading on the decisions made and lessons learned in the past. Ito Decl., ¶ 17. Put differently, the technical information developed for one generation of NAND flash memory technology often confers a competitive advantage with respect to multiple generations of new technology to come. *Id.*

SanDisk takes reasonable steps to protect its trade secret information from disclosure. During the timeframe prior to, during, and after Hynix's theft, SanDisk:

- required that its employees sign non-disclosure agreements promising to keep

[3] [redacted]

[4] Nevertheless, Toshiba is fully aware of this *ex parte* application and "supports SanDisk's request for an order requiring Hynix to return all SanDisk–Toshiba confidential, proprietary and trade secret information to SanDisk." *See* Declaration of Hiroaki Hazama in Support of SanDisk's Ex Parte Application, ¶¶ 4–6.

SanDisk's technical information confidential;

- required that employees attend training on SanDisk's confidentiality policies;
- kept its confidential documents on dedicated servers in California and Japan that could only be accessed from authorized computers;
- restricted access to those SanDisk employees who needed it; and
- typically marked sensitive documents with a "Confidential" notation.[5]

**D. Sugita stole SanDisk's trade secrets at Hynix's direction and Hynix received them knowing they had been misappropriated.**

Between February 2003 and June 2008, SanDisk employed Sugita as a process integration engineer responsible for failure analysis on products in development. Koike Decl., ¶ 10; Ito Decl., ¶¶ 2–3. To perform this job, Sugita needed—and was given—access to a wide range of sensitive technical materials for multiple generations of devices and processes released for production, as well as the latest generation under development. Ito Decl., ¶¶ 3, 5.

When Sugita joined SanDisk, he signed a Proprietary Information and Inventions Agreement ("PIIA") with SanDisk, through which he promised:

> At all times, both during my employment by the Company and after my termination, I will keep in confidence and trust all Proprietary information and I will not use or disclose any Proprietary Information … without the written consent of the Company….

*See* Koike Decl., ¶ 12 and Ex. 2. Additionally, when Sugita resigned from SanDisk in mid-2008, he signed a Termination Statement again acknowledging and committing for the future to abide by his obligation not to "disclos[e] Proprietary Information to any outside party." *Id.* at Ex. 3.

Despite Sugita's clear and continuing obligations, he misappropriated ***ten gigabytes*** of SanDisk's trade secret information, at least some of which he then made available to his new employer Hynix. *See* Koike Decl., ¶ 14. While at Hynix, another former SanDisk employee, Hironobu Nakao, witnessed first-hand Hynix's receipt and misuse of SanDisk's confidential trade secret information provided by Sugita. *Id.* at ¶¶ 15–16. As the whistleblower explained in his email—much of which has been confirmed through the Tokyo Police's investigation—Sugita:

- downloaded "10 GigaBytes" or more from SanDisk's networks, including confidential information related to various SanDisk generations and technologies;

[5] Koike Decl., ¶ 8; Ito Decl., ¶ 5. Nevertheless, employees were (and are) instructed that all SanDisk technical and business information should be treated as confidential, whether or not it is so marked. *See* Koike Decl., ¶ 8.

- "brought these files into Hynix's office;"
- "frequently displayed [SanDisk's trade secret documents] on his PC monitor in Hynix's office and explained them to Hynix employees;"
- "sent some of [the trade secret documents] to Hynix's employees by his email;"
- copied them into his own reports, which he "posted [to] Hynix's database;" and
- delivered SanDisk's trade secret information to Hynix after "***Hynix requested*** that Sugita" download SanDisk's files before he resigned.

*See* Koike Decl., Ex. 4 (emphasis added).

**E. Nakao provided copies of some of the stolen SanDisk files that were maintained on Hynix's network.**

In February 2014, SanDisk analyzed the contents of a flash drive provided by the whistleblower, Nakao. It contains undeniable evidence of Hynix's receipt and misuse of important SanDisk trade secrets—just as Nakao reported. Ito Decl., ¶¶ 6–8. The flash drive contains copies of several presentations that Nakao downloaded from Hynix's database as proof that Hynix was misusing SanDisk's trade secret information, and it is plain from the face of the presentations that SanDisk's information was used at Hynix. *See id.*; Koike Decl., ¶ 17, Ex. 4.

In the ***first*** of the presentations, Sugita pasted together various stolen SanDisk reports, affixed his name on the front cover, and added a Hynix watermark. Ito Decl., ¶¶ 8–9. Except for a few Sugita comments and edits and the addition of Hynix's watermark, the Hynix presentation contains exact copies of SanDisk's original source documents. *Id.* A reference on one of the pages to the information being from "T-Company" is an obvious reference to SanDisk's development partner, Toshiba. *Id.* at ¶ 9. Sugita made little effort to hide other indicia showing the source of the information, though it would have been obvious anyway since Hynix had hired Sugita from SanDisk. For example, there are repeated references to numbers such as CP40410, CP25416, CE3261, CE3256 and CE2990 that are unique, internal SanDisk codes for its development or production lots. Ito Decl., ¶¶ 8, 14 and Ex. 8. Hynix's misappropriation is also immediately apparent from a comparison of the Hynix presentation with the original SanDisk documents from which it was copied. *Compare* Ito Decl., Ex. 8 (Hynix copy) *with* Ex. 11 (SanDisk original); *see also* Ito Decl., ¶ 9 ("[M]any of the pages in Exhibit 8 … are identical to the compilation of SanDisk documents attached as Exhibit 11….").

Hynix's theft of the ***second*** presentation is more obvious still, as it still contains labels identifying each page as SanDisk–Toshiba confidential information. SanDisk's and Toshiba's names are branded onto each of the document's 22 pages, and each page also bears an internal SanDisk Joint Development reference code, SDJD-MG063; the only change is the addition of Hynix's watermark (across each page) and Hynix's logo (in the bottom left-hand corner of each page). *See* Ito Decl., ¶ 10 and Ex. 9. A comparison of the presentation with the original document from SanDisk's own network makes clear that the purloined presentation came from the SanDisk–Toshiba joint venture. *Compare* Ito Decl., Ex. 9 *with* Ex. 12.

The ***third*** presentation is similar, though "TOSHIBA" confidentiality notations have been removed, and Hynix's watermark has been added. *Compare* Ito Decl., Ex. 10 *with* Ex. 13.

**F. Evidence from the Tokyo Police corroborates Nakao's accusations.**

After Sugita was detained, the Tokyo Police provided SanDisk with screenshots showing the names of files stored on a hard drive that they seized from Sugita during his arrest. The Tokyo Police subsequently provided SanDisk with the contents of those files that appeared to have come from SanDisk, so that SanDisk could identify whether these were stolen SanDisk documents. Koike Decl., ¶ 23. In summary:

1. The seized hard drive contains ten gigabytes of confidential SanDisk material—the same volume estimated by Nakao in his email. Ito Decl., ¶ 15;
2. Almost all of the files on Sugita's computer are SanDisk's, and most of them contain SanDisk's trade secret information. *Id.*;
3. The file names and cover pages of many of these documents make it immediately clear that they are, and contain, confidential SanDisk information. *See id.* at ¶¶ 13–15 and Exs. 14–16;
4. The files contain critical information related to at least four generations of SanDisk's products, including 70nm, 56nm, 43nm and 32nm. *Id.* at ¶ 14; and
5. The files cover every stage of NAND flash memory design and production—including design development, unit process technologies, process integration, memory cell operation and testing development. *Id.* at ¶ 16.

Since his arrest on March 13, 2014, Sugita has reportedly confessed to stealing SanDisk's proprietary trade secret information out of pique for having been demoted, and has described the stolen trade secrets as a gift to his new employer. Koike Decl., ¶¶ 19–20. On April 3, 2014, the Tokyo prosecutor charged Sugita with fraudulent acquisition of trade secrets under Article

21(1)(iii) of the Unfair Competition Prevention Act. *See* Koike Decl., ¶¶ 19, Ex. 7. The charges include specific details of Hynix's receipt of the information stolen by Sugita. *Id.* at Ex. 7.

**G. Hynix was economically motivated to induce Sugita's misappropriation.**

While SanDisk and Toshiba were among the first innovators in NAND flash, Hynix admits that it was a late entrant to the industry, first selling NAND flash at the end of 2003. Ragland Decl., Ex. N at 79:10–18. In 2008, Hynix "struggled through a difficult year in NAND flash," plunging from third to sixth place in the global rankings and battling to migrate to the smaller 4x generation. *Id.* at Ex. C, 9, 13. According to one Hynix report, Hynix was 11 months behind the competition when it solicited Sugita to quit SanDisk and download its trade secrets in return for new employment. *Id.* at Ex. E. Then, suddenly, Hynix's fortunes dramatically began to change. Shortly after Sugita joined Hynix, Hynix managed to slash its industry lag time from *11 months* to *7 months*. By 2009, Hynix's latest 32nm product—a Hynix geometry that matched SanDisk's exactly[6]—was only *3 months* behind the curve. Despite Hynix's terrible 2008 and its having "entered [the] NAND market later than competitors," Hynix suddenly found itself in a position to brag that it had "managed to reduce the gap with the leaders…." *Id.*

The information stolen by Hynix still has great value to Hynix, or to others to whom it might be disclosed. Each new generation of NAND flash memory technology is based upon the designs and processes used to make preceding generations of devices, just as each new car is not created by reinventing the wheel. Armed with purloined information about what designs, materials, and processes SanDisk used (or evaluated and ruled out) in developing four generations of NAND flash memory, Hynix can know where to begin, and what to avoid, when developing future generations of devices. "By misappropriating such information, a competitor can short-circuit the design and development process, saving millions in R&D and jump-starting the development of next generation technologies to compete with SanDisk." Ito Decl., ¶ 17. Hynix is still working on, testing and qualifying 2x and 1x products, which are the direct and immediate

[6] For years prior to Sugita's theft, SanDisk's and Hynix's process generation measurements were different. Then, surprisingly soon after Hynix hired Sugita and received SanDisk's trade secret information, Hynix released a product identical in size to SanDisk's 3x offering. *See* Ragland, Exs. B and D. SanDisk's earlier releases included 56nm and 43nm products; Hynix's, by contrast, measured 57nm, 48nm and 41nm. Ragland Decl., ¶¶ 6–7.

successors to the 3x generation of NAND technology. *See* Ragland Decl., Ex. F at 34–35.[7] Hynix will make these 2x and 1x products available to its customers in California through its US subsidiaries later this year.[8] This potential for further misuse alone presents a threat of further irreparable harm to SanDisk so long as SanDisk's trade secrets remain in Hynix's possession, where they can be accessed by Hynix's employees. Ito Decl., ¶ 17; Koike Decl., ¶ 26.

As long as SanDisk's trade secrets remain with Hynix, they are also at risk of disclosure and dissemination to competitors, upstarts, and other third parties. As discussed above, SanDisk takes steps to protect and maintain its trade secrets—but it has no ability to control how Hynix and its employees may disclose, copy, forward, sell, or otherwise misappropriate or misuse this information. SanDisk is also concerned about how its trade secret information may be transformed, renamed, hidden or spoliated by Hynix to conceal its true origins.

### H. SanDisk acted promptly to seek Hynix's return of its stolen property, but Hynix ignored and then refused SanDisk's requests.

SanDisk first learned about Hynix's theft on January 24, 2014, when its joint development partner Toshiba gave SanDisk a copy of the email it obtained from former Hynix employee Nakao.[9] Koike Decl., ¶ 15 and Ex. 4. SanDisk immediately commenced an investigation, contacted the Tokyo Police to provide evidence of Hynix's theft (from the Nakao flash drive), and abided by the police's request to stay silent until Sugita was apprehended. *Id.* at ¶¶ 17–18.

As soon as SanDisk learned of Sugita's arrest on March 12, 2014 (March 13 in Japan), SanDisk's counsel notified Hynix that SanDisk intended to file suit against it for trade secret misappropriation. *See* Ragland Decl., Ex. H; Koike Decl., ¶ 19. SanDisk also demanded that Hynix cease using SanDisk's trade secrets and immediately return to SanDisk's counsel all copies of SanDisk's information still in Hynix's possession. Ragland Decl., Ex. H. SanDisk filed and served this lawsuit the very next day, and Hynix Memory Solutions's General Counsel, Kenneth

---

[7] This Hynix "Databook" notes that some Hynix 2x class products will be available in Q214, while the availability date for certain 1x class products is still "TBD" (*i.e.*, to be determined).

[8] In its annual report, SK Hynix, Inc. describes SK Hynix America, Inc. as its "overseas sales entity." *See* Ragland Decl., Ex. G at 8; *see also* Ex. O (explaining that a job at SK Hynix America, Inc. involves "promoting SK hynix's … NAND Flash product lines to SK Hynix's OEM accounts").

[9] Although the whistleblower's email appears to have been addressed to two SanDisk executives, SanDisk confirmed that there is no record that the email was delivered to either individual's email account. *See* Koike Decl., ¶ 14. SanDisk first received this email in January 2014. *Id.*

Racine, confirmed Hynix's receipt of both the complaint and SanDisk's letter requesting that Hynix cease using and immediately return all of SanDisk's information. *Id.* at ¶ 12.

Hynix then went dark for almost two months. *Id.* at ¶¶ 13–14. On April 9, 2014—having received no word from Hynix, nor any agreement to return SanDisk's stolen information or preserve evidence of its misappropriation—SanDisk reserved and the Court docketed, an *ex parte* hearing for May 9. *Id.* at ¶ 13. While Hynix's silence continued, its outside counsel Paul Hastings apparently assisted Hynix with an internal investigation into the theft. *See id.* at ¶ 21–22, Ex. L (biography describing Ms. Douvas's "recent" work for "[a] large Korean conglomerate in an internal investigation into the misappropriation of trade secrets").[10] Sill, Paul Hastings did not surface until April 30, shortly before the hearing date, and then only to request a continuance of the date based on their team's unavailability. On May 1, SanDisk reiterated that Hynix should agree to cease using and return all copies of SanDisk's information, and offered to provide a list of search terms that Hynix could use to find information in addition to that which Hynix already knew it had. *Id.* at ¶¶ 16–17; *see also id.* at Ex. I. On May 1, Hynix's counsel said they would consider this, so SanDisk agreed to continue the hearing to the Court's next available date, May 13, and asked for a response to its request by 5 p.m. on May 7. *Id.* At 5:23 p.m. on May 7, Paul Hastings's Barry Sher sent an email in which he curtly responded only that "we do not believe your client's latest demands have any merit," and derided SanDisk's legitimate request for a return of its stolen property as "improper" and an "abuse" of this Court's *ex parte* procedures. *Id.* at Ex. J. Notably, Hynix has never denied that it misappropriated and continues to possess and use SanDisk's trade secret information. Rather, Hynix has resorted to the age-old tactic of a thief caught red-handed: blame the victim and accuse it of "abuse" for seeking redress.

## III. ARGUMENT

### A. A temporary restraining order is necessary to prevent further harm to SanDisk.

In California, actual or threatened trade secret misappropriation may be enjoined through a TRO and a court can compel affirmative acts to prevent further harm—such as an order to

[10] Notably, this entry did ***not*** appear on Ms. Douvas's firm biography in mid-2013. *See* Ragland Decl., ¶ 22 and Ex. M. Even if this representation was not related to this matter, Hynix presumably initiated an internal investigation as soon as it learned of SanDisk's claims—as almost any large company would do.

return stolen documents. *See* Cal. Civ. Code § 3426.2(a) and (c). Section 3426.2(c) is directed to the very remedy sought here—the return of stolen property:

> Section 2(c) authorizes mandatory injunctions requiring that a misappropriator return the fruits of misappropriation to an aggrieved person, e.g., ***the return of stolen blueprints*** or the surrender of surreptitious photographs or recordings.

*See* Uniform Trade Secrets Act, cmt. to § 2 (emphasis added).

In deciding whether to issue a temporary restraining order, "a court must weigh two 'interrelated' factors: (1) the likelihood that the moving party will ultimately prevail on the merits and (2) the relative interim harm to the parties from issuance or non-issuance of the injunction." *Butt v. State of California*, 4 Cal. 4th 668, 677–78 (1992); *Hunt v. Superior Court*, 21 Cal. 4th 984, 999 (1999). These two factors operate on a sliding scale: where the likelihood of success is high, the Court may issue injunctive relief even if the likelihood of irreparable harm is lower. *See Common Cause of California v. Bd. of Supervisors*, 49 Cal. 3d 432, 446–47 (1989).

**1. SanDisk's likelihood of success is high.**

To succeed on its misappropriation claim, SanDisk need only show three things: (i) the information at issue qualifies as "trade secret," (ii) Hynix acquired SanDisk's trade secrets and (iii) at the time of the acquisition, Hynix knew, or had reason to know, that the trade secrets were acquired by improper means.[11] As to the first element, information qualifies as "trade secret" if (i) it has value from not being generally known to others who could gain advantage from its use, and (ii) the holder made reasonable efforts to maintain its secrecy. *See* Cal. Civ. Code § 3426.1(d); *see also ABBA Rubber Co. v. Seaquist*, 235 Cal. App. 3d 1, 18 (1991); *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1454 (2002). Ample evidence supports each element.

***First***, the stolen materials are classic trade secrets, comprising highly confidential design, development and processing specifications, and R&D protocols and results relating to complex semiconductor devices. The materials whose return SanDisk seeks "include critically important information about SanDisk's technology for several generations of its semiconductor products and processes … covering every stage of NAND flash memory product design and production."

---

[11] Hynix's counsel has not suggested that the Court lacks personal jurisdiction to issue a cease and return order to Hynix, and for good reason. Such a defense would fail, not least because Hynix has repeatedly acknowledged (or taken advantage of) California courts' jurisdiction over it. *See* Ragland Decl, ¶¶ 26–29.

Ito Decl., ¶ 16. This information is "extremely valuable" and not generally known to the public or to others in the industry who could take advantage of it; nor is it readily ascertainable through reverse engineering or other legitimate means. Ito Decl. ¶ 17; Koike Decl. ¶¶ 25–27. As a result, SanDisk has taken—and continues to take—reasonable efforts to maintain its secrecy. *See, e.g.*, Koike Decl., ¶¶ 8, 12–13.

***Second***, SanDisk has presented clear and convincing "smoking gun" evidence that Hynix acquired and used at least some of the SanDisk trade secret information stolen by Sugita at its behest. Ito Decl., ¶¶ 6–11. SanDisk learned of the theft from an informant who worked at Hynix and personally observed the misappropriation, and who backed his accusations up with evidence downloaded from Hynix's servers that bears clear indicia of its source, and that it was presented to Hynix by Sugita. Moreover, Nakao's statements that Sugita downloaded around 10 gigabytes of information, that SanDisk's trade secrets were loaded onto Hynix's database, and that Sugita told him that Hynix had asked Sugita to download SanDisk's files before he resigned, have all been corroborated either by evidence from the laptop seized during Sugita's arrest, or by news reports quoting admissions Sugita made to the Tokyo Police that are consistent with Nakao's assertions. Koike Decl., ¶ 19 and Exs. 4–6.

The reports of Sugita's admissions also appear to be reliable. For example, it is not public knowledge that Sugita was demoted before he quit his job at SanDisk and took its trade secrets to Hynix, and yet the Japan News reported on March 16, 2014: "Yoshitaka Sugita … was quoted by police as saying 'I wanted to switch jobs because of a grievance over a demotion.'" Koike Decl., Ex. 5. The same article quotes Sugita as admitting to investigators that he "brought Toshiba's data into my workplace at SK Hynix and offered them the data, as I was asked to do so by one of my colleagues there." *Id.* Hynix reportedly doubled Sugita's salary (notwithstanding that SanDisk had demoted him for poor performance), and the police suspect that Sugita's job benefits were conditioned on his bringing over SanDisk and Toshiba's research information. Koike Decl., Exs. 5–6. If proven, this would establish that Hynix's misappropriation was willful and malicious, for which double damages and the payment of SanDisk's attorneys' fees would be appropriate. Notably, Hynix has never denied the truth of Nakao's information or Sugita's

admissions of Hynix's involvement quoted in the Tokyo press. *Compare* Ragland Decl., Ex. I *with* Ex. J.

***Third***, even had Hynix not induced Sugita to steal SanDisk's trade secrets,[12] Hynix knew, or had reason to know, that Sugita acquired these materials by improper means. Not only do the R&D documents from Hynix's server contain SanDisk's proprietary technologies and results, but they bear SanDisk's and Toshiba's logos and other indicia that they are not from Hynix's own R&D, such as SanDisk lot numbers, a reference to "T-Company," and references to 56 and 43 nm generation technologies, which are the specific 5x and 4x technologies developed and used by SanDisk and Toshiba, not Hynix. Many of the pages reproduced above Hynix's watermark are prominently labeled "Toshiba/SanDisk Confidential." Hynix could not possibly have believed this was Hynix's own R&D information, rather than SanDisk–Toshiba trade secret information disclosed to it by its new hire from SanDisk, Sugita. *See, e.g.*, Ito Decl., Ex. 9. Hynix also knew, or should have known, that Sugita had signed agreements promising to protect the confidentiality of SanDisk's trade secrets—as this is standard practice in the industry. Koike Decl., ¶ 12.

**2. SanDisk will suffer irreparable harm if its trade secrets remain under Hynix's custody and control.**

As a threshold matter, "California courts have presumed irreparable harm when proprietary information is misappropriated." *TMX Funding, Inc. v. Impero Techs., Inc.*, Civ. No. 10-00202, 2010 WL 1028254, at *8 (N.D.Cal. Mar.18, 2010) (compelling return of hardware, software and "Confidential, Proprietary and/or Trade Secret Information relating to the business of Teledex LLC…."); *see also W. Directories, Inc. v. Golden Guide Directories, Inc.* Civ. No. 09-01625, 2009 WL 1625945 (N.D. Cal. June 8, 2009) ("The Court presumes that Plaintiff will suffer irreparable harm if its proprietary information is misappropriated."). SanDisk seeks the return of all copies of its confidential documents and trade secret information to prevent further dissemination, use, or incorporation of SanDisk's trade secrets into Hynix's products, processes and documentation, as well as their potential disclosure to third parties or to the public by Hynix employees. "Injunctive relief is often appropriate in trade secret cases to insure against additional

[12] The whistleblower reports that Hynix did indeed solicit SanDisk's confidential documents. *See* Koike Decl., Ex. 4.

harm from further unauthorized use of the trade secret and to deprive the defendant of additional benefits from the appropriation." *See* Restatement (Third) of Unfair Competition, § 44 cmt. c (1995). Plaintiffs seeking preliminary injunctive relief need only show that irreparable injury is likely, not certain. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 8 (2008).

After Sugita's theft, Hynix released a generation of NAND flash memory technology that was the exact same size as SanDisk's 3x technology (*i.e.*, 32nm)—and in record time. *See* Ragland Decl., Ex. E; *see also id.* at Exs. B and D. Plainly, Hynix was using SanDisk's and Toshiba's trade secret information rapidly to create its own 32nm products. Today, Hynix continues to work on, qualify, produce and release its 2x products, which are just one generation away from SanDisk's 32nm technology. If Hynix still retains SanDisk's trade secret information, Hynix can continue to use these trade secrets as models or benchmarks for Hynix's development of its "next generation" products. Ito Decl., ¶ 17.

Hynix has no legitimate claim to keep any materials or information that it knows came from SanDisk and/or Toshiba, or that can be identified by searching Hynix's documents and databases using the search terms SanDisk provided to Hynix's counsel on May 2. Indeed, since Hynix's counsel has been assisting Hynix with its internal investigation for some weeks, many of the purloined documents may already have been identified.

**3. The requested relief is narrowly tailored to address Sugita's misappropriation and will not burden Hynix.**

In evaluating interim harm to the parties, "the trial court compares the injury to the plaintiff in the absence of an injunction to the injury the defendant is likely to suffer if an injunction is issued." *IT Corp. v. County of Imperial*, 35 Cal. 3d 63, 70 (1983). This balancing test tips in favor of plaintiffs, like SanDisk, who have a "vital interest in protecting [their] trade secret information." *See Wyndham Resort Devel. Corp. v. Bingham*, Civ. No. 10-01556, 2010 WL 2720920 (E.D. Cal., July 8, 2010), *7 (order granted because the "relief sought by [Plaintiffs] is specific to the use of proprietary information belonging to [Plaintiffs]…. Accordingly, the balance of hardships weighs in favor of [Plaintiffs].").

SanDisk requests narrow relief: an order that requires only that Hynix cease using and return whatever information it knows it misappropriated, and any SanDisk information identified

by the search terms SanDisk has provided. When granting a similar TRO request in *Bank of America, N.A. v. Immel*, Judge White held that the "return of [Plaintiff's] confidential information and a prohibition on the use of that information by Defendants" was "very narrow." 2010 WL 2380877 (N.D. Cal. June 11, 2010) at *3.

Hynix has never raised, let alone articulated, any injury to itself as a basis for refusing to return SanDisk's stolen property. It has never claimed any undue burden for running a search using SanDisk's proposed terms, nor has it ever asked SanDisk to narrow those terms—so it should not be heard to do so when it appears to contest SanDisk's motion. Moreover, Hynix's suggestion that SanDisk "adhere to the process the Court established in its March 14, 2014 Order," *i.e.*, wait until discovery commences after the initial CMC on July 18, gives SanDisk no relief. SanDisk's motion asks that Hynix be ordered to cease using and return SanDisk's stolen information, not just identify it during discovery some months from now.

A TRO is the only way to prevent (or, at least, minimize) further irreparable harm to SanDisk. Where, as here, the balance of hardship tips sharply in favor of the movant, the Court should issue a TRO. *See Robbins v. Super. Ct.*, 38 Cal. 3d 199, 205 (1985) ("If the denial of an injunction would result in great harm to the plaintiff, and the defendants would suffer little harm if it were granted, then it is an abuse of discretion to fail to grant the preliminary injunction.").

## IV. CONCLUSION

For the foregoing reasons, SanDisk ask the Court to issue a temporary restraining order and an order to show cause why a preliminary injunction should not issue.

Dated: May 19, 2014

KEKER & VAN NEST LLP

By: Jeffrey Chanin /NM
JEFFREY R. CHANIN

Attorneys for Plaintiff SANDISK CORPORATION